IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

PAUL D. AMMERMAN,

                    Plaintiff,                    OPINION AND ORDER

v.

                                                  17-cv-800-wmc

NURSE SEAMAN,

                    Defendant.

      This court granted *pro se* plaintiff Paul D. Ammerman leave to proceed on Eighth Amendment claims against defendant Mary Seaman under 42 U.S.C. § 1983 for deliberate indifference to his serious medical needs during a blood pressure check on May 5, 2017. (Dkt. #23.) Before the court is defendant's motion for summary judgment (dkt. #35) and plaintiff's subsequent motions for sanctions (dkt. ##42, 47). For the following reasons, the court will decline to impose sanctions, while granting in part and denying in part defendant's motion for summary judgment.[1] As to the latter motion specifically, defendant is entitled to summary judgment with respect to plaintiff's claim that she acted with deliberate indifference to the concerns he raised about his pain medications, but not to his claim that she disregarded his symptoms of difficulty breathing and chest pain, which will proceed to trial.

---

[1] Plaintiff has also filed an "[e]mergency motion for rebuttal" and attachments in response to defendant's reply brief, which is essentially a sur-reply. (Dkt. #46.) Though plaintiff was not granted leave to file a sur-reply, given his *pro se* status, the court will also grant this motion and consider his arguments, which do not change the outcome.

UNDISPUTED FACTS[2]

For all times relevant to his complaint, Ammerman has been incarcerated at Columbia Correctional Institution ("Columbia"). Defendant Seaman was a nurse employed by the Department of Corrections ("DOC") at Dodge Correctional Institution. For one to two weeks in May 2017, including on May 5, she also worked as a "float" at Columbia, where part of her duties included seeing multiple patients for blood pressure checks.

Ammerman suffers from various health conditions. He has carpel tunnel syndrome and was prescribed duloxetine to soothe his pain and help him sleep. He also has high blood pressure, and among other medications, takes hydrochlorothiazide to treat this condition. In April 2017, an advanced care provider ordered Ammerman weekly blood pressure checks for four weeks with monthly checks to follow. In the HSU, these checks are generally scheduled as five-minute appointments, one after the other. During a check, the patient must sit down so the blood pressure cuff can be placed on his arm and remain claim and relaxed to ensure an accurate reading. The patient's blood pressure is then recorded in his medical file.

Ammerman came to the HSU in the morning on May 5 for a routine blood pressure

---

[2] Unless otherwise noted, the following facts are deemed material and undisputed. Consistent with its general practice, the court has drawn these facts from the parties' proposed findings and the cited evidence of record, viewed in a light most favorable to Ammerman. *See Miller v. Gonzalez*, 761 F.3d 822, 877 (7th Cir. 2014) ("We must . . . construe the record in the light most favorable to the nonmovant and avoid the temptation to decide which party's version of the facts is more likely true."). Where plaintiff purports to dispute defendant's proposed facts, the court only credits relevant responses that are supported by citation to the record and admissible at trial. *See* Fed. R. Civ. P. 56(c)(2).

check with Nurse Seamen. The parties dispute whether Ammerman sat down after he entered the room but there is no dispute that Ammerman immediately asked Seaman why he was receiving duloxetine in the morning, rather than at night, which was something that Seaman declined to address or to ask the prescribing physician about, who happened to be nearby. Instead, Seaman told Ammerman to file a health service request ("HSR"), which Ammerman had already done two day before. (Dkt. #39-1 at 70.) Although not discussed at the time, there appears to be no dispute that a medication is typically given during the morning medication pass unless a provider specifies otherwise. (Dkt. #44 at 11.) Moreover, although also apparently not discussed, Ammerman's prescription for duloxetine did not indicate that the medication had to be taken at a certain time. (Dkt. #44 at 11.)

Ammerman admits that he became angry after asking Seaman three times about his medication. (Dkt. #44 at 14-15.) Nurse Seaman attests that Ammerman's anger made her concerned for her safety, and she not only ended the appointment per her training without reading Ammerman's blood pressure, but had to call an officer to escort Ammerman out of the HSU. (Dkt. #38 at 6.). While Ammerman admits getting angry, he disputes being threatening, noting that had that been the case, an incident or conduct report would have been created. (Dkt. #44 at 14-17.) The record contains neither. Regardless, Seaman did not believe that missing one blood pressure check would cause a serious risk to Ammerman's health, and she attests further that she would have been unable to obtain an accurate blood pressure reading while Ammerman was upset. (Dkt. #38 at 6.)

3

Nurse Seaman could not prescribe medications, nor override or alter orders issued by advanced care providers. (Dkt. #38 at 2.) She further attests that inmates know to submit HSRs to request medical treatment for non-emergency issues -- if an inmate has an emergent, urgent issue such as chest pain, trouble breathing, or uncontrolled bleeding, he should alert a staff member who will then contact the HSU. (Dkt. #38 at 3.)

Ammerman and Nurse Seaman disagree as to whether he indicated a serious medical need during his blood pressure appointment. Ammerman alleges that because he was taking duloxetine in the morning, he was in pain and had not slept much during the prior 48 hours, but does not claim that he told Nurse Seaman about these specific concerns. Nor does Ammerman claim that he was obviously symptomatic, sweating, nauseated, or vomiting. (Dkt. #44 at 18.) Still, Ammerman *does* allege that he *told* Nurse Seaman that he was experiencing chest pains and difficulty breathing. (Dkt. #44 at 17.) Nurse Seaman disputes this assertion, however, and also attests that had Ammerman appeared symptomatic or complained of chest pain or difficulty breathing, she would have "immediately encouraged him to calm down so she could take his vitals," as well as listen to his lungs and chest with a stethoscope for any sounds outside normal limits.[3] (Dkt. #44

---

[3] Ammerman filed an HSR and an inmate complaint about this incident and appealed from the dismissal of that complaint. (Dkt. ##39-1 at 69, 45-1.) Ammerman states in his HSR that he "confronted" Seaman "about my medication called duloxetine," but she was "only there to take [his] blood pressure." (Dkt. #39-1 at 69.) In his May 17, 2017, inmate complaint, Ammerman further states that he "brought up" the duloxetine issue with the nurse, the two argued, and then the nurse asked Ammerman to leave "even though she knew that I had ongoing [complications] with my blood pressure." (Dkt. #45-1 at 1.) Ammerman also claims that he "started to black out and get dizzy" later that day. (Dkt. #45-1 at 1.) Similarly, in his inmate complaint appeal, Ammerman states that when he asked Nurse Seaman to change his medication time, she became "hostile" and she had him escorted back to his cell where he experienced "heart problems." (Dkt. #45-1 at 3.) Ammerman repeatedly faults the nurse for failing to take his blood pressure. (Dkt. #45-1 at 2, 4.)

4

at 18-19.)

Still, as a result of Seaman's inaction, Ammerman claims that he experienced "dizzy spells, pressure on his chest, difficulty breathing, and had a seizure" in his cell.[4] (Dkt. #10 at 3.) After telling a corrections officer about his symptoms, Ammerman received an electrocardiogram ("ECG") in the HSU that afternoon to measure the electrical activity of his heartbeat. Ammerman had an elevated heart rate of 120 beats per minute, but received no additional medical attention at that time.

Approximately eight months later, in January 2018, Ammerman went to University of Wisconsin Heart & Vascular Care Services for a total cardiac workup. A provider's note from that visit includes the following description of Ammerman's May 5 episode of "tachycardia"[5]:

> [Ammerman] had an argument with the nurse over his medications and she refused to take his blood pressure. When he left her office, he developed difficulty breathing, diaphoresis [sweating], and was told he looked pale. He denies chest pain. He was evaluated in the HSU and ECG showed that his heart rate was 120 beats per minute (per patient report).

(Dkt. #39-1 at 38.) Ammerman disputes the accuracy of this summary, asserting that he was experiencing chest pains and difficulty breathing before his appointment with Seaman. (Dkt. #44 at 25-26.) Although an ECG conducted at UW Health showed "trace

---

[4] Ammerman has not been diagnosed with a seizure disorder, although he has reported experiencing what he believes were seizures or seizure-like symptoms. (Dkt. #44 at 20-21.)

[5] Tachycardia is the medical term for a heart rate over 100 beats per minute; although in some cases it may cause no symptoms or complications, "if left untreated, tachycardia can disrupt normal heart function and lead to serious complications" such as heart failure, stroke, or sudden cardiac arrest or death. *See* "Tachycardia," Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/tachycardia/symptoms-causes/syc-20355127 (accessed January 20, 2021).

regurgitation" in Ammerman's pulmonic valve, there were "[n]o significant structural or valvular abnormalities to explain fainting spells." (Dkt. #39-1 at 32, 34.)

OPINION

As noted, plaintiff claims that Nurse Seaman was deliberately indifferent to his serious medical needs during a blood pressure check on May 5, 2017, when she refused to (1) address his concerns regarding the administration time of his pain medication and (2) check his blood pressure in response to his complaints of chest pain and difficulty breathing.[6] Defendant seeks summary judgment on the basis that plaintiff has failed to put forth sufficient evidence to support a jury finding that she was aware he was suffering from a serious medical need and disregarded that need at excessive risk to plaintiff's health. Alternatively, Seaman claims entitlement to qualified immunity.

Summary judgment is appropriate if the moving party shows "there is no genuine

---

[6] Nurse Seaman argues in reply that she would be prejudiced by the court's consideration of this claim because its screening order granted Ammerman leave to proceed only on the issue of his medication administration time. (Dkt. #43 at 2-3.) While the screening order finds support for an inference of deliberate indifference in Ammerman's allegations that Seaman "refused to address his concern that he was receiving his medication at the wrong time" (dkt. #23 at 4), Ammerman's amended complaint alleged a failure to respond reasonably to both his medication concerns *and* his alleged emergent symptoms. (Dkt. #10 at 2-3.) The screening order also acknowledges the latter issue by (1) recounting Ammerman's allegation that he informed Seaman about his symptoms during the appointment, and (2) concluding that Ammerman had sufficiently alleged his high blood pressure, especially in combination with those symptoms, constituted a serious medical need, thus leaving the question of whether Seaman had failed to take reasonable measures to address his needs. (Dkt. #23 at 2-3.) Moreover, the court's order granted Ammerman leave to proceed on deliberate indifference *claims* against Seaman. (Dkt. #23 at 7.) Finally, the parties have addressed this additional claim in their briefing, and Seaman addressed plaintiff's alleged symptoms in her declaration (dkt. #38 at 5) and proposed findings of fact (dkt. #44 at 17-19). Accordingly, the court disagrees that Seaman is prejudiced by its consideration. Regardless, having granted defendant's motion to strike the trial date, she will have additional time to prepare for trial on this claim.

6

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). During summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences supported merely by speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019).

## I. Eighth Amendment Claims

The Eighth Amendment gives prisoners the right to receive adequate medical care. *Estelle v. Gamble*, 429 U.S. 97 (1976). To prevail on a claim of constitutionally inadequate medical care, a plaintiff must show that he either suffered from or was at risk of an objectively serious medical need. A serious medical need is one that has either been diagnosed by a doctor as requiring treatment or one that is obviously serious even to a lay person. *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (7th Cir. 1997).

After clearing that hurdle, a plaintiff must also show that the defendant was deliberately (that is, subjectively) indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). "Deliberate indifference" means that the official knew or inferred that the prisoner faced a substantial risk of serious harm, but disregarded that risk by consciously failing to take reasonable measures to address it. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). It is *more than* negligent

7

acts, or even grossly negligent acts, although it requires something less than *purposeful* acts. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994); *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("While evidence of malpractice is not enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance."); *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) ("the infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in nature in the criminal sense").  The court addresses plaintiff's two claims of defendant's deliberate indifference under that standard.

### A. Medication Administration Time for Duloxetine

To begin, Nurse Seaman contends that she is not liable because Ammerman's concern about his medication dosing time does not qualify as an objectively serious medical need, and there is no evidence that she disregarded a perceived substantial risk of serious harm in any event.  The court agrees.  The record here shows that Ammerman took duloxetine to relieve his carpal tunnel pain and thus help him sleep, while he alleges that having to take this medication in the morning meant he experienced pain at night and lost sleep.  While "deliberate indifference to prolonged, unnecessary pain can itself be the basis for an Eighth Amendment claim," *Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012), some courts have found that loss of sleep cannot.  *See, e.g.*, *Collins v. LeBlanc*, No. 11-0077-JJB, 2012 WL 528172, at *4 (M.D. La. Jan. 19, 2012) (finding that, as a general proposition, loss of sleep does not constitute a condition serious enough to support a deliberate indifference claim); *Smith v. Crose*, No. 06-3168 (FSH), 2006 WL 2591075, at

*5 (D. N.J. Sept. 8, 2006) (finding that a plaintiff's insomnia and "reduced ability to fall asleep does not amount to a serious medical need.") Even if Ammerman had a serious medical need to take duloxetine at a different time to relieve pain or assist with sleep, there is insufficient evidence from which a reasonable jury could infer Nurse Seaman knew on May 5, 2017, that the morning dosing time had caused Ammerman substantial harm or created a substantial risk of harm to him when he came to her for a blood pressure check. *See Farmer,* 511 U.S. at 838 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference").

While there is no dispute that Nurse Seaman knew that Ammerman was concerned about his pain medication, the undisputed facts also show Ammerman only told Seaman that he wanted to change the dosing time. Ammerman admits he became angry after having asked Seaman three times to address the problem, but does not allege that he also told her that he was without pain medication, or that he was in pain and missing sleep as a result of taking duloxetine in the morning. (*See* dkt. ##10 at 2-3, 44 at 9-12.) Nor does Ammerman claim that he was obviously in pain or tired.

Thus, there is no evidence in this record that Seaman had reason to infer his concern presented a serious medical need, much less one that needed urgent attention, only that it

may have seemed urgent to Ammerman.[7] Although Ammerman was obviously frustrated by Seaman's advice to address his medication concern through the slower HSR process -- especially when it seemed more efficient to him, perhaps understandably, to have the nurse interrupt her duties and speak directly to the prescribing physician nearby -- Ammerman's appointment was very short, its purpose was to conduct a routine blood pressure check, and Seaman had multiple patients to test that day for blood pressure, apparently at five-minute intervals. Under these circumstances, and without evidence from which a reasonable jury could conclude that Seaman knew taking duloxetine in the morning rather than at night was causing Ammerman significant pain and loss of sleep (or otherwise creating a substantial risk of serious harm to him), Seaman's response might be characterized as uncaring, perhaps even negligent, but it does not rise to the level of deliberate indifference, so defendant is entitled to summary judgment on this claim.[8]

## B. Chest Pain and Difficulty Breathing

Because of the disputed record, the question is much closer with respect to Ammerman's claim that, in light of his hypertension, Nurse Seaman did not reasonably respond to his complaint of chest pain and difficulty breathing at serious risk to plaintiff's

---

[7] Plaintiff argues in his brief that because Nurse Seaman had reviewed his medical records, she necessarily knew that he had been prescribed duloxetine to treat his carpal tunnel pain and to help him sleep. (Dkt. #40 at 18-19.) That Seaman had this knowledge in 2020, while preparing her declaration in support of her motion for summary judgment, however, is not evidence of what she knew as a float nurse about Ammerman when he came to the HSU for a routine blood pressure check in 2017. Even if a jury could reasonably infer such knowledge, it does not reasonably follow that his pain required urgent attention.

[8] Given this ruling, the court need not address Seaman's qualified immunity argument with respect to this claim.

health. As a result, Ammerman claims that he had to return to his cell without having received medical care and worse still, continued to suffer his symptoms and experienced a seizure or seizure-like episode before he was able to undergo an ECG that afternoon, which confirmed an elevated heart rate of 120 beats per minute.[9]

With respect to this claim, a reasonable jury could infer that Seaman knew or should have known that Ammerman suffered from high blood pressure given the nature of his appointment. And she does not argue that high blood pressure in combination with these other symptoms would not have constituted a serious medical need. *See Jackson v. Pollion*, 733 F.3d 786, 789 (7th Cir. 2013) (high blood pressure is a serious condition and may be a symptom of increased risk of other serious problems, such as a stroke or a heart attack); *cf. Mata v. Saiz*, 427 F.3d 745, 754 (10th Cir. 2005) (severe chest pain, a symptom consistent with a heart attack, is a serious medical condition under the objective prong).

Rather, Seaman questions the credibility of Ammerman's version of events. Seaman

---

[9] In fairness, Ammerman acknowledges that he received no additional medical attention that day even after his ECG, and his 2018 cardiac evaluation revealed "trace regurgitation" but no significant abnormalities, raising a legitimate question as to whether he was injured or harmed by any delay in care in this case. *See Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) ("there is no tort—common law, statutory, or constitutional—without an injury, actual or at least probabilistic"). As noted, however, prolonged, unnecessary pain and suffering can constitute harm, and a jury *may* credit Ammerman's testimony regarding his pain and other symptoms, culminating in an episode of tachycardia as a causal injury of Seaman's alleged deliberate indifference. *See Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) (recognizing that "hours of needless suffering" can constitute harm); *see also Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1039-40 (7th Cir. 2012) (evidence that defendant "exacerbated [plaintiff's] injuries" or that plaintiff suffered "prolonged, unnecessary pain" can support an Eighth Amendment claim). Even so, without evidence of physical injury, Ammerman's relief may be limited to punitive or even $1 in nominal damages. *See Rasho v. Elyea*, 856 F.3d 469, 477 (7th Cir. 2017) (even if the plaintiff were unable to point to any physical injury, the lack of such an injury would not bar his deliberate indifference to medical needs claim but rather limit the damages he could recover).

admits that once Ammerman became agitated, she chose not to check his blood pressure, nor otherwise attempt to examine him, although she attests that Ammerman did not appear symptomatic and, contrary to his account, denies that Ammerman told her that he was experiencing chest pain and difficulty breathing. She further attests that Ammerman became belligerent and threatening when she would not address his medication concerns, requiring him to be removed from the HSU without taking a blood pressure reading because she felt unsafe. While Ammerman does not dispute that he may not have been manifesting any symptoms beyond anger, he specifically attests to describing his chest pains and difficulty breathing, as well as denies being threatening, noting that no conduct or incident report was generated. In contrast, Seaman explains that had she known Ammerman was experiencing any of these symptoms, she would have responded by immediately trying to calm him down and taking his vitals, as well as by listening to his chest and lungs with a stethoscope "for sounds that would not be within normal limits." (Dkt. #38 at 5.) As a result, the crucial fact of what *Seaman* knew is disputed: Ammerman alleges under penalty of perjury in his amended complaint and in response to defendant's proposed findings of fact that he *did* tell her about his symptoms, while Seaman denies this. (Dkt. ##10 at 2, 41 at 7.) At summary judgment, a court must "construe the record in the light most favorable to the nonmovant and avoid the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

Nevertheless, Seaman argues that on this record, no reasonable jury could accept Ammerman's version of events: that he told Seaman about his symptoms *and* that he was

actually experiencing such symptoms at the time of his appointment. In support, defendant directs the court to a Seventh Circuit decision quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007), for the proposition that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." In *Scott*, the non-movant's version of a car chase included his having driven in a controlled and careful manner, which was blatantly discredited by a video of the chase that "more closely resemble[d] a Hollywood-style car chase of the most frightening sort[.]" *Id*. Here, unfortunately, there is no similarly definitive evidence, video or otherwise, on which the court can rely.

Instead, Seaman points to Ammerman's inmate complaint about the appointment, his appeal from the dismissal of that complaint, the provider's note from his 2018 visit to UW Health Heart & Vascular Care Services, and the declaration of a fellow inmate, Mathew Gebhardt. Only two of these documents were written by Ammerman, and none definitively establish whether on May 5, 2017, he told Seaman about his claimed symptoms. For example, inmate Gebhardt does not (and could not) attest to what may have occurred during the appointment, nor does he attest to seeing or speaking with Ammerman beforehand. Instead, he attests that Ammerman told him about his chest pain and difficulty breathing after the appointment, and that Ammerman "fell down and passed out." (Dkt. #2 at 1.)

Certainly, the provider's note, Ammerman's inmate complaint and his appeal lend support to Seaman's version of events, having failed to assert that he told her of his chest

13

pain and breathing issues. Although written nearly eight months after his appointment with Seaman, and Ammerman disputes its accuracy, the provider's note in particular is problematic for Ammerman in that it does not document a May 5, 2017, fainting spell and indicates his symptoms began when he left the appointment and did not include chest pain. (Dkt. #39-1 at 38.) As for his inmate complaint, Ammerman asserts that he experienced dizziness later in the day and does not specifically reference any other symptoms, but he also claims that Seaman was aware of more than just his medication concerns: "she knew [Ammerman] had ongoing [complications] with [his] blood pressure." (Dkt. #45-1 at 1.) Ammerman does not reference emergent symptoms in his appeal either; instead, he describes raising a medication issue with Seaman, who became "hostile," and alerting a sergeant later that he "was having heart problems." (Dkt. #45-1 at 3.) In light of these documents, Ammerman could certainly face an uphill battle at trial, but it is for a jury to sift through the evidence, including Ammerman's and Seaman's conflicting testimony, and to decide whether Seaman's actions were reasonable in light of the credible evidence and circumstances. *See Stone v. City of Chicago*, 738 F.2d 896, 900 (7th Cir. 1984) (it is uniquely the function of the jury to sift through conflicting evidence).

    At its core, Seaman's argument that Ammerman's sworn allegations and responses based on his firsthand experience are insufficient to defeat summary judgment is another way of saying that his testimony is not credible. The court simply cannot make such credibility determinations on summary judgment -- not even when one version of events seems implausible, *see Pauley*, 337 F.3d at 771, and not even when, as here, the contradictory evidence in question is self-serving. *Id*. at 772. Perhaps the jury will believe

14

that Seaman acted entirely reasonably given the circumstances. However, if the jury credits Ammerman's testimony that he complained to Seaman of chest pain and difficulty breathing, yet she did not attempt to calm him down and evaluate him, nor alert anyone else to the problem when she felt it too unsafe to continue, nor otherwise follow up, this could form a sufficient factual basis for the jury to find that Seaman was deliberately indifferent. *See Wallace v. Hounshel*, No. 1:06-cv-1560-WTL-TAB, 2009 WL 734714, at *6 (S.D. Ind. March 19, 2009) (denying summary judgment to nurse who failed to recheck inmate's blood pressure or otherwise provide him medical care after learning that he had had extremely high blood pressure accompanied by chest pain and had been placed on hypertension medication by a physician who had not examined him); *cf. Gonzales v. Wright*, No. 9:06-CV-1424 (JMH), 2010 WL 681323, at *11 (N.D. N.Y. Feb. 23, 2010) (finding at summary judgment no Eighth Amendment violation where medical personnel treated or attempted to treat plaintiff's presumably serious conditions despite abusive conduct on plaintiff's part).

That leaves the question of qualified immunity from monetary damages with respect to this claim. Qualified immunity "protects government officials from damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (quoting *Estate of Clark v. Walker*, 865 F.3d 544, 549-50 (7th Cir. 2017)). The inquiry is two-fold: "(1) whether the facts, taken in the light most favorable to the plaintiff[ ], show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation."

*Gonzales v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009). Moreover, the Seventh Circuit recently reminded courts that "clearly established law cannot be framed at a 'high level of generality.'" *Campbell*, 936 F.3d at 545 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S. Ct. 2074 (2011)). Rather, "[e]xisting caselaw must dictate the resolution of the parties' dispute," meaning that the "precedent must have placed the . . . constitutional question beyond debate.'" *Campbell*, 936 F.3d at 545 (citations omitted). Accordingly, courts must "[f]rame the constitutional right in terms granular enough to provide fair notice." *Id.*

Ammerman rightly emphasizes that his right to adequate medical care and treatment of his conditions is longstanding. *See Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011) ("Based on our earlier discussion of the law governing deliberate indifference claims, we have no difficulty in concluding that the right to adequate medical care and treatment of conditions of inmates was clearly established at all times during the relevant actions in this case."). Seaman counters that Ammerman is framing the right in too general of terms to provide fair notice, and has not pointed to caselaw requiring her to address the non-urgent concerns of a hostile, threatening inmate or to continue an appointment with such an inmate.

However, the qualified immunity analysis also turns on the plaintiff's version of the facts. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right); *Estate of Heenan ex rel. Heenan v. City of Madison*, 111 F. Supp. 3d 929, 947 (W.D. Wis. 2015) ("Where factual disputes exist, a defendant must adopt *plaintiff's* version of the facts

in asserting his right to be free from the excessive force inflicted on him was not sufficiently clear at the time of the shooting."). Here, as noted, Ammerman admits that he became angry, but disputes he was threatening, and alleges that he did more than complain about his medication administration time. Instead, he claims that while he may not have been obviously symptomatic, he specifically told Seaman that he was experiencing chest pains and difficulty breathing, arguably indicating he was in serious medical need. Seaman herself admits that had she known about these symptoms, she would have taken immediate steps to calm and evaluate Ammerman.

Since it was clearly established by 2017 that Ammerman was entitled to treatment for an urgent medical need, and a reasonable factfinder might conclude that Seaman did not reasonably respond to it, summary judgment is not appropriate on his claim. *See, e.g.*, *Mathison v. Moats*, 812 F.3d 594, 597-98 (7th Cir. 2016) (reversing a grant of summary judgment in favor of defendant nurse who postponed treatment of inmate experiencing chest and arm pain despite knowing inmate, who eventually had a heart attack, was being treated for chronic high blood pressure); *Gayton v. McCoy*, 593 F.3d 610, 623-34 (7th Cir. 2010) (reversing a grant of summary judgment in favor of defendant nurse who refused to treat inmate with CHF who had complained of chest pain, exhibited high blood pressure hours earlier, and vomited); *cf. Wellman v. Faulkner*, 715 F.2d 269, 273-74 (7th Cir. 1983) (describing "seemingly inadequate medical care" received by inmate who complained of chest pain and was not sent to the hospital for nine hours even though his blood pressure dropped to 60/40 and his pulse rose to 120 beats per minute).

In reaching this holding, the court acknowledges the many hurdles that plaintiff

faces before a jury. Even if Ammerman were to convince a jury that he complained to Seaman of chest pain and breathing difficulties on May 5, 2017, defendant is right to point out that a jury may find those complaints were not enough to require Seaman to do more given Ammerman's anger and lack of manifest symptoms at the time. There is also the question as to whether Ammerman was, in fact, actually experiencing chest pain and difficulty breathing, much less a serious medical need, and suffered an injury in light of the lack of any definitive proof that he experienced a serious pain event, much less a medical injury, as opposed to escalated breathing and heart rate brought on by his own anger. However, on this record, a jury must sort out the conflicting, material evidence, even if just barely so.

## II. Motions for Sanctions

Finally, Ammerman has filed a motion for sanctions against Seaman and a motion for sanctions against defense counsel. (Dkt. ##42, 47.) While this court has "inherent authority to sanction conduct that abuses the judicial process," *Montano v. City of Chicago*, 535 F.3d 558, 563 (7th Cir. 2008), it does not do so lightly, nor for the following reasons, will it impose any sanctions here.

First, Ammerman contends that Seaman made false statements in her declaration in support of summary judgment, and he asks that: (1) her declaration be stricken; (2) Seaman be denied summary judgment; and (3) the court charge her criminally with perjury. However, Ammerman merely identifies disagreements between the parties about the underlying facts of the case. For example, Ammerman disputes Seaman's statements that: (1) she never told her about any emergent symptoms; (2) he was threatening and had to

18

be escorted from the HSU; (3) she could not address other health concerns during a blood pressure check; (4) she would have immediately tried to evaluate him had she known about his symptoms; (5) he refused to sit down when he entered the room; and (6) Ammerman's blood pressure was recorded at 103/84 on May 8, 2017.[10] Factual disputes commonly occur in the context of litigation. Very rarely can a court to take sides and make a determination regarding a party's credibility; regardless, for the reasons set forth above, these are all issues reserved for the jury in this case. *Townsend v. Fuchs*, 522 F.3d 765, 774-775 (7th Cir. 2008).

As for criminal charges, Ammerman has not shown that Seaman's declaration meets the standard for perjury, which is "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). In any event, "[w]hether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion." *United States v. Batchelder*, 442 U.S. 114, 124 (1979). Ammerman has certainly no entitlement to civil sanctions against Seaman at this time.

Nor is Ammerman entitled to sanctions against defense counsel, who he claims misrepresented facts in her reply brief. Specifically, he faults defense counsel for arguing

---

[10] Seaman bases her statement regarding Ammerman's blood pressure on his vitals flow sheet, which indicates that on May 8, 2017, at 10:35 a.m., he had a pulse of 88 beats per minute and a blood pressure reading of 103/84. (Dkt. #39-1 at 81.) Ammerman instead points to his May 8, 2017, progress notes, which Seaman also provided to the court, indicating a blood pressure reading of 151/103 taken at 7:55 a.m. (Dkt. ##39-1 at 9, 42-1 at 1.) It thus appears that Ammerman's blood pressure was elevated in the morning on May 8. To the extent there is a dispute of fact here, it is not material to the court's decision on summary judgment.

that the court should not consider Ammerman's deliberate indifference claim regarding his alleged symptoms even though Ammerman had stated that claim in his amended complaint. He asks that (1) Seaman be denied summary judgment, (2) defense counsel's law license be revoked and that she be investigated for obstruction, and (3) he be awarded punitive damages. However, defense counsel simply made a reasoned argument based on the court's screening order, which is counsel's job, and which the court has rejected in Ammerman's favor. Accordingly, his motion will be denied, and the court strongly encourages Ammerman to concentrate on preparations for the difficult job ahead of convincing a lay jury of the merit of his claim, rather than spending any further time or effort on seeking sanctions against the defendant or her counsel.

ORDER

IT IS ORDERED that:

1) Defendant Nurse Seaman's motion for summary judgment (dkt. #35) is GRANTED in part and DENIED in part.

2) Plaintiff Paul D. Ammerman's motions for sanctions (dkt. ##42, 47) are DENIED.

3) Plaintiff's emergency motion for rebuttal (dkt. #46) is GRANTED.

4) A telephonic scheduling conference will be set before Magistrate Judge Crocker. Counsel for defendant is responsible for initiating the call to the court.

Entered this 27th day of January, 2021.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge